**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| In re<br><br>GEORGE HARAS,<br><br>　　　　　　　　Debtor<br>―――――――――――――――――<br>R.C. OLSEN CADILLAC, INC.,<br><br>　　　　　Plaintiff<br><br>v.<br><br>GEORGE HARAS,<br><br>　　　　　Defendant | Chapter 7<br>Case No. 14-13554-FJB<br><br><br><br><br>Adversary Proceeding<br>No. 14-1213 |

**MEMORANDUM OF DECISION**

**I.     Overview**

On July 30, 2014, the defendant and chapter 7 debtor, George Haras ("Hara") filed a voluntary petition under chapter 7 of the Bankruptcy Code, commencing the present bankruptcy case. On November 3, 2014, the plaintiff, R.C. Olsen Cadillac, Inc. ("R.C. Olsen"), timely filed the complaint commencing this adversary proceeding. By its complaint, R.C. Olsen seeks a determination that a judgment debt owed to it by Haras is excepted from discharge under 11 U.S.C. § 523(a)(2)(A). The parties tried the matter on March 4, 2015. The Court now makes the following findings and rulings and on the basis thereof concludes that the judgment debt is excepted from discharge in its entirety, including all accrued and accruing interest thereon.

**II.     Findings of Fact**

On or about September 11, 1996, Haras purchased a 1994 Cadillac Seville SLS Sedan (the "Vehicle") with 19,000 miles on it from City Line Auto Sales ("City Line"). Based on expert testimony

which I have deemed credible, the approximate fair market value of a 1994 Cadillac Seville SLS Sedan in 1996 was at that time between $20,000 and $22,000. Haras purchased the Vehicle for $7,900.

A Carfax Vehicle History Report ("Carfax Report") for the Vehicle was admitted into evidence and I incorporate its contents into my findings. The Carfax Report shows that a salvage title was issued for the Vehicle by the Department of Motor Vehicles in Aurora, Illinois on August 13, 1996, just less than a month before Haras purchased the Vehicle. This issuance of a salvage title typically follows some type of major damage and significantly decreases the resale value of a vehicle. Haras was aware that City Line had a practice of selling cars with salvage titles, although he knew that City Line sold non-salvage used vehicles as well.

Haras testified that he had no knowledge of the Vehicle's salvage title. I do not find Haras credible on this point. He purchased the Vehicle for roughly a third of its fair market value from a seller he knew to be in the practice of selling vehicles with salvage titles. I infer from these circumstances that Haras was aware of the Vehicle's history and its salvage title.

The Carfax Report indicates that in December 1996, a new title was issued for the Vehicle by the Department of Motor Vehicle ("DMV") in Burlington, Massachusetts. Haras testified that this title listed the owner of the Vehicle as U.S. Environmental Technologies, Inc., a company owned and operated by Haras. The Carfax Report indicates that on March 18, 1998, the DMV in Burlington again issued a new title for the Vehicle. This title was introduced into evidence. It lists Haras's wife, Lorraine, as the owner, and it lists Haras as a lienholder. No mention of the salvaged status of the Vehicle is contained in this title.

In or around December 1998, Haras and his wife, Lorraine Haras, offered to sell the Vehicle to R.C. Olsen, a dealer and seller of motor vehicles located in Woburn, Massachusetts. At that time, the Vehicle had roughly 40,000 miles on it. Haras presented the most recent title, which listed Lorraine Haras as the owner and omitted any mention of the Vehicle's salvage status, to R.C. Olsen. R.C. Olsen

relied on the title presented by Haras.  Massachusetts law provides that any transferor of a vehicle for which a salvage title has been issued shall fully and fairly disclose that fact to any transferee for value.  M.G.L. 90D § 20(C) (d).  Haras admits that he did not disclose to R.C. Olsen the fact that a salvage title had been issued for the Vehicle, stating that he was not aware of it.  I have found above that Haras was aware of the salvage title.  Accordingly, I also find that Haras deliberately failed to disclose his knowledge of the Vehicle's salvage title to R.C. Olsen.

R.C. Olsen purchased the Vehicle from Haras for $13,500.  R.C. Olsen inspected the Vehicle and test-drove it, but it did not conduct any type of title inquiry prior to purchasing the Vehicle from Haras.  David Robinson ("Robinson"), who has been employed by the R.C. Olsen sales department since 1986, testified at the trial.  Robinson testified, and I credit, that R.C. Olsen did not routinely conduct title inquiries at the time it purchased the Vehicle from Haras.  Robinson explained that prior to the advent of online databases, a title inquiry required a trip to the DMV.  Further, R.C. Olsen lent credence to the trustworthiness of local customers.  Haras resided in Burlington and his business address was on Cambridge Street in Burlington which is up the road from R.C. Olsen's Cambridge Road address in Woburn.

Robinson also testified that Haras represented to another R.C. Olsen employee that the Vehicle had been a "one-owner car" in that it had only ever been owned by Haras, his wife, or his business.  Haras did not object to the introduction of this testimony, but he does deny having made such a representation.  Additionally, Robinson admitted that he did not personally witness any such representation.  Accordingly, I afford this testimony little weight in my analysis.

After completing the purchase from Haras, R.C. Olsen began to prepare the car for resale, a process which included submitting a warranty claim to General Motors.  The warranty claim was rejected by General Motors which prompted R.C. Olsen to conduct an investigation into the Vehicle's history and chain of title.  R.C. Olsen subsequently learned about the issuance of the salvage title.

Robinson testified, and I credit, that a dealership's options for selling a salvage vehicle are limited and will result in a significantly lower sales price than selling a vehicle with a clean title. R.C. Olsen sold the Vehicle at auction for $8,000.

R.C. Olsen attempted to contact Haras immediately upon learning about the Vehicle's salvage title with the aim of correcting the problem by reversing the deal. Haras did not respond to R.C. Olsen's attempts to contact him. R.C. Olsen eventually brought suit against Haras in Woburn District Court and obtained a judgment.

### III.    Jurisdiction

The matter before the Court is a complaint under 11 U.S.C. § 523(a) to determine the dischargeability of a debt. The matter arises under the Bankruptcy Code and in a bankruptcy case and therefore falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by standing order of reference, referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a). It is a core proceeding. 28 U.S.C. § 157(b)(2)(I) (core proceedings include determinations as to the dischargeability of particular debts). This Court accordingly has authority to enter final judgment in the matter. 28 U.S.C. § 157(b)(1).

### IV.    Applicable Law

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). In order to establish that a debt is nondischargeable under § 523(a)(2)(A) due to a false representation, the plaintiff must prove each of the following elements by a preponderance of the evidence: "1) the debtor made a knowingly false representation or one made in reckless disregard of the truth; 2) the debtor intended to deceive; 3) the debtor intended to induce the creditor to rely upon the false statement; 4) the creditor actually relied upon the misrepresentation; 5) the creditor's reliance was justifiable; and 6) the reliance upon the

4

false statement caused damage." *McCrory v. Spigel* (*In re Spigel*), 260 F.3d 27, 32 (1st Cir. 2001), citing *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997).

The first element, making a knowingly false representation, refers to the conduct of the debtor and can include a debtor's promise to act, "[i]f, at the time he made his promise, the debtor did not *intend to perform*[.]" *Palmacci*, 121 F.3d at 786-87.  The second element, intent to deceive, refers to the Debtor's mental state and specifically requires a mental state embracing an intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380–81, 47 L.Ed.2d 668 (1976); *Palmacci*, 121 F.3d at 786-87.  Intent to deceive may be demonstrated by showing that "a false representation has been made . . . recklessly, careless of whether it is true or false," or, in other words, with reckless disregard for the truth.  *Palmacci*, 121 F.3d at 787 (*citations omitted*).  "Availability of direct evidence to prove a debtor's intent to deceive a creditor is unlikely to be obtained. The court may infer fraudulent intent from the totality of circumstances*.*" *Danvers Savings Bank v. Alexander*, 427 B.R. 183, 195 (Bankr. D. Mass 2010), citing *Palmacci*, 121 F.3d at 789.  Among the circumstances from which scienter may be inferred are: the defendant's insolvency or some other reason to know that he cannot pay, his repudiation of the promise soon after made, or his failure even to attempt any performance.  *Palmacci*, 121 F.3d at 789.  Although the inquiries are distinct, in many cases the same factors show both the debtor's knowledge or recklessness as to the falsity of his representation and his intent to deceive. *Faria v. Silva (In re Silva)*, 2014 WL 217889 at *5 (Bankr. D. Mass. 2014), citing *Bellas Pavers, LLC v. Stewart (In re Stewart),* MB 12–017, 2012 WL 5189048 at *8 n. 4 (B.A.P. 1st Cir. 2012).

The final four elements embody the requirement that the creditor's claim must arise directly from the debtor's fraud.  *Faria*, 2014 WL 217889 at *5, citing *McCrory*, 260 F.3d at 32.  As to the creditor's reliance, the Supreme Court of the United States has held that § 523(a)(2)(A) requires only justifiable reliance—a lower standard than reasonableness.  *Field v. Mans,* 516 U.S. 59, 70 (1995).

5

Reliance is justifiable if the falsity of the representation would not have been readily apparent to the person to whom it was made. *Id.* at 70-72. For purposes of determining whether reliance was justified, "the circumstances of the reliance claim must be taken into account," and "the individual is not obliged to investigate statements made to him (although he cannot shut his eyes to an obvious falsehood)." *Lentz v. Spadoni* (*In re Spadoni*), 316 F.3d 56, 59 (1st Cir.2003).

**V.     Analysis**

On the basis of the findings of fact set forth above, I find by a preponderance of the evidence that Haras made a knowingly false representation when he conveyed to R.C. Olsen what appeared to be a clean title for the Vehicle without disclosing the Vehicle's prior salvage title. The finder of fact may infer the debtor's knowledge as to the falsity of his representations as well as his intent to deceive from the totality of the circumstances. Haras bought a $20,000 car for $7,900. He bought it from a dealer which he knew had a practice of selling salvaged cars. He sold it two years later after adding 21,000 miles to it for $13,500. I infer that Haras was aware of the Vehicle's history and that he deliberately misrepresented it to R.C. Olsen in an attempt to deceive the car dealership.

I also find that Haras intended to induce R.C. Olsen to rely on his misrepresentation, that R.C. Olsen actually relied on his misrepresentation, and that R.C. Olsen suffered damages as a result of this reliance. Haras made his misrepresentation in the context of selling the Vehicle to a car dealership who was clearly willing to pay more for a vehicle with a clean title than a salvage title. The parties do not dispute that R.C. Olsen reached its $13,500 offer based on the false understanding that the title was clean. Further, the parties do not dispute that R.C. Olsen eventually sold the Vehicle for significantly less money than it would have received otherwise.

The only remaining question is whether R.C. Olsen's reliance was justifiable. It is undisputed that had R.C. Olsen done some digging, it would have discovered the salvage title. However, justifiable reliance is a lower standard than reasonableness. Absent an obvious falsehood, a creditor is not

required to investigate the falsity of a debtor's statement.  Prior to the advent of online databases, R.C. Olsen relied on the trustworthiness of local customers like Haras.  Haras presented a title which on its face was free from defects even though Haras had reason to believe otherwise.  The falsity of Haras's representation was not readily apparent and R.C. Olsen was not required to investigate its falsity.  Accordingly, I find that the R.C. Olsen's reliance on Haras's misrepresentation was justifiable.

For the above reasons, I conclude that R.C. Olsen has established cause to except the judgment debt from discharge under § 523(a)(2)(A).

**VI.    Conclusion**

For the reasons set forth above, the Court will enter a separate judgment declaring that the judgment debt is excepted from discharge under § 523(a)(2)(A) in its entirety, including all accrued and accruing interest thereon.

.

Date:  March 9, 2015                                            _____
                                                                Frank J. Bailey
                                                                United States Bankruptcy Judge